UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> ALBERT E. PARISH, JR., PARISH ECONOMICS, LLC, and SUMMERVILLE HARD ASSETS, LLC, <br><br> Defendants. | CIVIL ACTION NO. <br> 2:07-cv-00919-DCN |

**ORDER APPROVING SECTION 5 OF THE RECEIVER'S PLAN
FOR CLAIMS ADMINISTRATION AND DISTRIBUTION OF PROCEEDS
AND APPROVING THE SCHEDULES OF CLAIMS AND
AUTHORIZING DISTRIBUTION OF PROCEEDS**

This matter is before the court on the Receiver's Motion to Approve Plan for Claims Administration and Distribution of Proceeds ("Motion to Approve Plan") (Dkt. # 267) and Motion to Approve Schedules of Allowed Claims and Authorize Distribution of Proceeds ("Motion to Approve Claim Schedules") (Dkt. # 322). For the reasons set forth below, the court: (1) grants the Receiver's Motion to Approve Plan and approves the method of distribution proposed in Section 5 of the Plan; and (2) grants the Receiver's Motion to Approve Claim Schedules and, subject to the modifications ordered herein, approves the Schedules of Allowed Claims at issue in the motion.

## I.  Background

1. This enforcement action was filed on April 5, 2007, by the Securities Exchange Commission against Albert E. Parish ("Parish"), Parish Economics, LLC ("Parish Economics"), and Summerville Hard Assets, LLC ("SHA").  The SEC alleged that Parish operated a fraudulent investment scheme in violation of securities laws through Parish Economics and SHA.

2. In its *Order to Show Cause, Temporary Restraining Order, Order Appointing Receiver, Order Freezing Assets, Order Prohibiting Destruction of Documents and Order Expediting Discovery* entered on April 5, 2007, this court appointed S. Gregory Hays as Receiver for Parish.  (Dkt. # 7.)  Among other things, this court authorized and directed the Receiver to take possession, custody, and control of the assets of the Receiver Estate, manage those assets, and ultimately distribute those assets to investors and creditors with valid claims against the Estate.  This authority, along with all other aspects of the Receivership Order, was continued pursuant to the terms of this court's *Order Granting Preliminary Injunction, Freezing Assets, Appointing Receiver and Ordering Other Ancillary Relief* entered April 12, 2007 (dkt. # 26) (this Order and the Receivership Order shall be referenced collectively as the "Receivership Orders").

3. In accordance with his responsibilities under the Receivership Orders, the Receiver has developed a process for the analysis and administration of the claims of Parish's investors and other creditors, along with a proposal for the ultimate distribution of the monies in the receivership estate, which is set forth in the Receiver's Plan.

4. On July 1, 2009, the court approved the claims administration portion of the Plan, *i.e.* Sections 1 through 4 and Section 6.  (See Dkt. # 298.)  The court deferred ruling on Section 5 of the Plan, which addresses the ultimate method of distribution to be used by the Receiver.  (Id.)

**A.     Development of the Claim Schedules.**

5. As set forth in the approved claims administration portion of the Plan, the Receiver has provided claim forms to all known individuals and entities who appear to have invested in Parish's investment pools, as well as individuals or entities who were known creditors of Parish. The Receiver has also made a copy of the respective investor and creditor claim forms available on his website (www.haysconsulting.net).

6. By Order dated June 14, 2007, this court established July 31, 2007, as the deadline for submission of a claim with the Receiver ("the Bar Date").

7. Over 550 claims were ultimately submitted to the Receiver by investors or creditors in this case ("Claimants"), representing total claims of over $95 million.

8. Relying upon the funds tracing database developed in this case and the information provided by claimants and other sources, the Receiver and the professionals working with him analyzed and reconciled all 550 of the claims that were submitted to the Receiver. This process ultimately took the Receiver and the professionals working with him several months to complete.

9. After completing the claims review and analysis process, the Receiver provided each investor and creditor who submitted a claim with a Claim Determination Notice setting forth the Receiver's determination as to the amount and validity of the claim.

10. Any claimant who disputed the Receiver's determination as to his or her claim was given the opportunity to submit a Claim Dispute Form to the Receiver describing the basis for the dispute. Section 4.2 of the Receiver's proposed Plan for Claims Administration and Distribution of Proceeds (the "Plan"), which section was approved by this court on July 1, 2009 (Dkt. # 298), requires all Claim Dispute Forms to be postmarked within 30 days of the date of the Receiver's Claim Determination Notice for the applicable claims. Based on the dates that the

Receiver mailed Claim Determination Notices to claimants, the time period within which claimants could object to the Receiver's determination of their claims has expired.

11. In total, 64 claimants submitted claim disputes to the Receiver. The Receiver had broad discretion under the Plan to resolve these claim disputes and, exercising such discretion, the Receiver ultimately resolved all of the claim disputes without requiring court intervention.

12. Based on the Receiver's determination as to the allowed amounts of all claims submitted in this case, as well as the resolutions of the disputes discussed above, the Receiver has developed and submitted to the court two schedules containing the amounts of the allowed claims in this case. The allowed amounts of all investor claims are set forth in the Schedule of Allowed Investor Claims attached to this Order as Exhibit "A" and incorporated herein by reference, and the allowed amounts of all creditor claims are set forth in the Schedule of Allowed Creditor Claims attached to this Order as Exhibit "B" and incorporated herein by reference.[1]

13. The Schedule of Allowed Investor Claims lists for each investor the Receiver's determinations as to the amounts of that investor's Allowed Actual Investment and Allowed Amount Previously Received, as those terms are defined in the Plan and as modified by this order. The Schedule of Allowed Creditor Claims lists the Receiver's determination as to the amount of each creditor's Actual Loss.

14. The Receiver has moved this court to approve the claim amounts listed in the Schedule of Allowed Investor Claims and Schedule of Allowed Creditor Claims so that the Receiver may make distributions to claimants in accordance with the amounts of their claims as identified in the Schedules.

---

[1] The attached Schedule of Investor Claims is different than the one submitted with the Receiver's motion. The changes in the revised schedule reflect the treatment of third-party settlements discussed in this order. The Schedule of Allowed Creditor Claims remains the same.

## B. The Proposed "Rising Tide" Method of Distribution.

15. As stated above, the court has deferred ruling on Section 5 of the Plan, which addresses the ultimate method of distribution to be used by the Receiver. In that Section, the Receiver has proposed using a method of distribution commonly referenced as the "Rising Tide" method.

16. In analyzing the method of distribution to be used in this case, the Receiver considered the two most widely accepted methods of distribution used in receiverships similar to this case: (1) pro-rata payments based on the Rising Tide calculation; and (2) pro-rata payments based on each investor's net loss (the "Net Loss" method of distribution).

17. The fundamental difference between these two methods is the way that prior payments are treated and accounted for in determining amounts to be distributed from the receivership estate to investor claimants.

18. Under the Net Loss method, prior payments to each investor are subtracted from the investor's total investment amount to determine the investor's net claim amount. All investors who suffered a net loss receive pro rata distributions in accordance with their net claim amounts.

19. Under the Rising Tide method, however, prior payments to each investor are credited against investors' pro-rata distributions from the receivership. In effect, an individual investor's loss is deemed to be the gross amount actually invested in the scheme. Payments received by the investor prior to the scheme's collapse are treated as "distributions" on par with the distributions to be made by the Receiver, so that prior amounts paid by Parish are credited against (i.e., subtracted from) the amount that would otherwise be paid from the receivership estate. Under this method, investors who received prior payments are entitled to receive a

smaller pro-rata payment from the receivership estate than those who received no prior payment. Moreover, investors who previously received payments exceeding their pro rata amount of the total distribution will receive no distribution from the receivership estate.

20. Because of the manner in which prior payments are treated under the two methods, investors who received little or no payments during the course of the Ponzi scheme stand to receive more in distributions from the receivership estate under the Rising Tide method of distribution than they would under the Net Loss method.

21. After considering the application of both methods, the Receiver and his counsel recommend the use of the Rising Tide method in this case. The Receiver considered the following factors, among others, to be particularly relevant in making this recommendation:

   a. The majority of the investor claimants, 332 in total, did not receive any payments from Parish – i.e., their entire investment was lost. As stated above, these investors stand to recover more under Rising Tide than Net Loss.

   b. The monies Parish used to make payments to investors were monies invested with Parish by other investors.

   c. Many of the investors who did receive payments from Parish actually collected a relatively large portion of their original investment prior to the collapse of the scheme.

22. Counsel for the Receiver has advised the court that he intends to make an initial distribution from the receivership estate to victims which, pending the resolution of certain tax issues, could total $9 million. Assuming $9 million is distributed from the estate, victims who received no payments from Parish or his related entities during the course of the Ponzi scheme

6

stand to receive distributions of approximately 18.6% of their total losses under Rising Tide, whereas they would only recover approximately 12.5% of their losses under Net Loss.

23. Further, in this case, 490 of the more than 540 investors who submitted claims to the Receiver actually suffered losses on their investments with Parish. If the Net Loss method is applied, all 490 will be entitled to a distribution from the estate. If the Rising Tide method is applied, 388 of the investors will receive a distribution. Notably, 350 of those investors will receive more under the Rising Tide method than they would under the Net Loss method. In other words, over 71% of the investors who suffered losses in this case will receive more under Rising Tide than they would receive under Net Loss.

24. Eight investors have filed objections to the Receiver's Motion to Approve Plan on the grounds that the Rising Tide method of distribution is inequitable. (Dkt. #'s 278, 280, 282, 284, 297 and 308.)[2] All but one of these investors stand to receive more in distributions from the estate if the Net Loss method is applied than he or she would receive under Rising Tide. The lone exception is Lynn Lane, who would receive slightly more under Rising Tide than Net Loss. However, Ms. Lane filed a joint objection with her husband, who will receive less under Rising Tide than he would under Net Loss. Collectively, the Lanes will receive less in distributions from the estate under Rising Tide than Net Loss.

C. **Objections to the Claim Schedules.**

---

[2] Two other objections to the Receiver's motion were filed and later withdrawn. (See Dkt. #'s 277, 281, 289, and 296.) Those objections related to the treatment of third-party recoveries, discussed below, rather than the use of Rising Tide. (See Dkt. #'s 277 and 281.)

7

25. Aside from the objections to the proposed method of distribution, four investors (Steven L. Smith, Richard Brown, Ryan Brown, and Louis Mancuso) have filed substantive objections to the Receiver's Motion to Approve Claim Schedules.[3] (Dkt. #'s 326 and 327.)

26. The fundamental ground under which these objections are made is that, in determining the amounts of the investors' claims, the Receiver has not properly accounted for amounts received by the investors in settlements with third parties.

27. Section 3.3 of the Plan provides that amounts paid to an investor claimant by "any… party in complete or partial satisfaction of the amounts claimed" will be included in the calculation of that investor's Amount Previously Received.

28. In short, the objecting investors take the position that including the amounts received by them in third-party settlements as Allowed Amounts Previously Received will unfairly prejudice them if the Rising Tide method of distribution is applied in this case.

29. During the hearing on the Motion to Approve Claim Schedules, the Receiver and his counsel advised the court that, in light of developments in this case following the proposal of the Plan, the Receiver now agrees with the objecting investors that, if Rising Tide is applied in this case, third-party settlements should be treated differently than currently provided under the Plan.

## II. Discussion

**A.  Rising Tide Versus Net Loss.**

The court is well aware that no distribution plan can treat the victims of Parish's scheme absolutely fairly. The only way to treat the victims fairly would be for each and every victim to

---

[3] Although Dr. Leonard Forrest also filed an objection to the Receiver's Motion to Approve Claim Schedules, his objection relates to the method of distribution proposed in Section 5 of the Receiver's Motion to Approve Plan rather than the Receiver's determination as to the amounts of his claim in the Schedule of Allowed Investor Claims. (See Dkt. # 329.)

be repaid in full. Unfortunately, this is impossible. It is the task of this court to choose not what is the "fairest" distribution plan, but to choose the plan which is the least unfair.

In deciding how the assets of the receivership estate should be paid out to aggrieved investors and other creditors, courts have "broad authority . . . to approve a plan of distribution proposed by [the] receiver." S.E.C. v. Byers, 637 F. Supp. 2d 166, 174 (S.D.N.Y. 2009) (citing S.E.C. v. Credit Bancorp, Ltd., 290 F.3d 80, 82-83 (2d Cir. 2002); S.E.C. v. Forex Asset Mgmt. LLC, 242 F.3d 325, 332 (5th Cir. 2001); S.E.C. v. Wang, 944 F.2d 80, 88 (2d Cir. 1991)). The court has the power to approve any plan as long as it is "'fair and reasonable.'" Byers, 637 F. Supp. 2d at 174 (quoting Wang, 944 F.2d at 81); see S.E.C. v. P.B. Ventures, 1991 WL 269982, at *2 (E.D. Pa. Dec. 11, 1991) ("No specific distribution scheme is mandated so long as the distribution is 'fair and equitable.'") (citation omitted).

Of course, the court is fully aware that what is "fair and equitable" for one victim may be perceived as "unfair and inequitable" to another, depending on how each stands to benefit under the selected distribution scheme. "For a District Court sitting in equity, . . . it is important to remember that each investor's recovery comes at the expense of the others." Byers, 637 F. Supp. 2d at 176. As the United States Court of Appeals for the Second Circuit has noted, "[w]hen funds are limited, hard choices must be made." Official Comm. of Unsecured Creditors of WorldCom, Inc. v. S.E.C., 467 F.3d 73, 84 (2d Cir. 2006) (internal citation and quotations omitted). When, as here, there is "a small pie and many disappointed investors," there is an inherent conflict among investors. Commodity Futures Trading Comm'n v. Hoffberg, 1993 WL 441984, at *2 (N.D. Ill. Oct. 28, 1993); see, S.E.C. v. TLC Investments and Trade Co., 147 F. Supp. 2d 1031, 1042 (C.D. Cal. 2001) (recognizing that in "any situation in which the pie is limited, each individual desiring a slice of that pie is, in a sense, adverse to others also wanting a

9

slice of the pie"). As the United States District Court for the Southern District of New York has aptly observed,

> where the assets of the receivership estate are insufficient to afford full recovery to all victims, any given plan is likely to be viewed more favorably by certain victims than others depending on how they fare under that plan . . . . An equitable plan is not necessarily a plan that everyone will like.

S.E.C. v. Credit Bancorp, Ltd., 2000 WL 1752979, at *29 (S.D.N.Y. Nov. 29, 2000).

Indeed, in this case, application of either the Rising Tide or Net Loss methods will benefit some victims at the expense of others. Approval of Rising Tide means that 102 investors who would have received payments under Net Loss will not receive any distributions from the estate (although, as discussed below, the reason they will not receive distributions is that they have already received payments from Parish during the course of the Ponzi scheme that exceed their proportionate share). Application of Net Loss, on the other hand, means that 350 investors will receive less from the estate than they would receive under Rising Tide.

### i. *Judicial Acceptance of Rising Tide Over Net Loss.*

A number of courts faced with circumstances similar to those in this case have determined that Rising Tide is a more appropriate method of distribution than Net Loss. For instance, the court in Commodity Futures Trading Comm'n v. Equity Fin. Group, 2005 WL 2143975 (D.N.J. Sep. 2, 2005), selected Rising Tide after considering a number of alternative methods of distribution, including Net Loss. The court held that Rising Tide was a more equitable approach than Net Loss because the Net Loss method results in "certain investors receiving back more than such investor's proportionate share of investments." Id. at *25. This is true because investors who received payments over the course of the Ponzi scheme that exceed their proportionate share are permitted under the Net Loss method to keep those payments ***and***

share in a distribution of the estate, thereby ultimately recovering more than other investors who did not receive any payments over the course of the scheme. See id.

The example used by the court to illustrate this concept is particularly appropriate. The court essentially considered two investors who both invested $100,000 in a case in which the interim distribution would be approximately 30%. See id. One of the investors received payments during the scheme of $50,000, or 50% of his investment, while the other received no payments during the scheme. See id. If Net Loss were applied in such a situation, the investor who had already received 50% of his investment would nevertheless receive an additional $15,000 in a distribution from the estate ($50,000 x .30), for total returns of 65% of his investment. See id. The investor who had not received any payments during the course of the scheme, however, would receive a distribution from the estate of $30,000, thereby only recouping 30% of his investment after the estate had been distributed. See id.

The results under Rising Tide were much more equitable. The first investor, who had already received 50% of his investment, would not be eligible to receive any amount in distribution from the estate, but would have still recouped 50% of his total investment amount. See id. Although the court did not note this in its example, forgoing a distribution to the first investor would actually make *more* funds available for distribution to other investors who, like the second investor, did not receive any payments during the course of the scheme, thereby increasing their total recovery to bring them more in line with the first investor.[4]

After considering this example, the court observed that,

---

[4] Under this scenario, the second investor, who received no payments during the scheme, would receive even more than $30,000 because the funds that were not distributed to those investors who, like the first investor, had already recovered more than their proportionate share would be available for distribution to the other investors.

11

> under the [Net Loss] method, investors who had previously received funds as withdrawals 'would benefit at the expense of other investors by retaining the benefit of the full amount of his withdrawal plus a distribution calculated on the basis of net funds invested, rather than the recommended distribution amount adjusted to take into account all amounts already received.' . . . Consequently, the Court finds the Receiver's method for treatment of withdrawals - the rising tide method - is appropriate.

Id. Other courts to consider Rising Tide versus Net Loss have also come to the conclusion that Rising Tide is a more equitable approach. See, e.g., United States v. Cabe, 311 F. Supp. 2d 501, 509 (D.S.C. 2003) (favoring Rising Tide over Net Loss and holding that persons who have been previously repaid by the defendants should receive a reduced amount so that the total amount they receive both for the receivership distribution and from the earlier repayment from the defendants would roughly equal the amount they would have received from a pro rata distribution had they not received any money during the scheme from the defendants); Hoffberg, 1993 WL 441984, at *2-3 (favoring Rising Tide over Net Loss); Commodity Futures Trading Comm'n v. Skorupskas, No. 83-cv-1885, 1988 U.S. Dist. LEXIS 18649, at *5-7 (E.D. Mich. Aug. 22, 1988) (favoring Rising Tide over Net Loss method).

The court in Cabe recognized that "[a] closer examination of [the Net Loss] proposal . . . reveals that it suffers from serious flaws and produces inequitable results because it ignores the illegal activities of the defendants," including the fact that the money paid to those investors during the course of the scheme "came from other victims of the fraud." Cabe, 311 F. Supp. 2d at 509-510. Similarly, the court in Skorupskas reasoned that because any "profits" (i.e., prior payments to investors) actually were part of the res, adoption of the Net Loss method would result in those investors who insisted on cashing out their "profits" receiving more from the res than their proportionate share based on their total investment and thereby, in effect, permitting those investors to defeat the goal of a pro rata distribution. Id.

## ii. *Rising Tide is Appropriate in this Case.*

In this case, those victims who received payments from Parish and his related entities during the course of his Ponzi scheme were actually being paid with money taken from other victims of the scheme. Because there was a fixed amount of investor funds invested with Parish over the course of the scheme, there was also a fixed amount that he could pay to investors and that may ultimately be distributed in this case. If the payments to some investors had not been made, the estate in this case would presumably be larger and the distribution to all investors would be greater. To adopt the Net Loss method would be to permit those investors who have already received more than their proportionate share of the res to receive even more investor funds via a distribution of the estate, at the expense of those victims who have not received any payments. The court believes such an approach is less equitable than the Rising Tide method, which will result in all investors receiving a relatively proportionate share of their lost investments after prior payments from Parish and distributions from the Receiver are taken into account.

The investors who have objected to Rising Tide have understandably done so because they stand to receive more in distributions under a Net Loss method than Rising Tide. However, the reason this is so is the very reason that Rising Tide is the more equitable approach in this case. The objecting investors will receive more under Net Loss because *they have already received* payments in excess, or at least partial satisfaction, of their proportionate share of the res.

For instance, Dr. Forrest, who is the only objecting investor to have been represented at the hearing on the Receiver's Motion to Approve Plan, is not expected to receive any distribution under Rising Tide. (Dkt. # 329 at 2.) The reason for this is that Dr. Forrest already received $715,302 in payments from Parish over the course of his Ponzi scheme. While Dr. Forrest points

13

out that he invested $3,000,000, and therefore suffered a loss of over $2.2 million, he has nonetheless received 23.8% of his investment in prior payments from Parish—a higher percentage than any investor who did not receive payments from Parish can ever hope to recover in this case. (See Dkt. # 322, Ex. A (Claim 187).) [5]

If the Net Loss method were applied, as Dr. Forrest has requested, he would receive an additional $285,695.67 from the estate,[6] making his total return $1,000,997.67, or 33.4% of his investment. However, victims who did not receive any payments from Parish would instead only recover 12.5% of their respective investments under Net Loss. The source of the $715,302 paid to Dr. Forrest was money taken by Parish from other defrauded investors. Because Dr. Forrest has already received more than his proportionate share, it would be inequitable to permit Dr. Forrest to be given an additional distribution from the receivership estate when most of his fellow victims have recovered nothing.

The objecting investors have asserted various justifications for why the prior payments from Parish should not be counted against them. For example, Objecting Investor Yoder contends that the investors who withdrew money regularly from their accounts may have needed the money to pay monthly expenses. (Dkt. # 284 at 2.) Dr. Forrest contends that he did not use

---

[5] Other examples are Objecting Investor Gazian, who has already received payments from Parish totaling 94.2% of his investment (see Dkt. # 322, Ex. A (Claim 212)), and Objecting Investor Yoder, who has received payments totaling 43.4% of her investment (see id. (Claim 693)). Because Objecting Investor David Lane did not receive payments in excess of 18.6% during the scheme, he stands to receive a distribution under Rising Tide that will bring his total percentage of returns up to 18.6%, which is on par with investors who did not receive any payments from Parish during the scheme. If Net Loss were applied, however, Lane would ultimately recover 24.9% of his investment. (See id. (Claim 343)).

[6] This amount assumes a distribution of $9 million. As discussed above, such a distribution amount would provide for a Net Loss distribution percentage to investors of approximately 12.5%.

the money that was paid to him by Parish for personal use, but instead reinvested it into a business that was related to Parish but is not part of the receivership estate, which business ultimately failed.[7] (Dkt. # 329 at 2-3.) Everyone is sympathetic to the situation of each of the objecting investors, who have undoubtedly suffered very real losses in this case; however, the court is also mindful that *hundreds* of victims have each lost a significant amount of money due to Parish's actions, and the majority of them—332 to be exact—have never received a dime. It would be unfair to reduce the distributions to those victims so that other investors, who have already recovered a portion of their losses, may recover more than their proportionate share.

In this case, more than 71% of the victims stand to receive more under the Rising Tide method than Net Loss. To apply Net Loss so that certain investors may recover more than their proportionate share of the res of investor funds—at the expense of the vast majority of investors—would not be a just result. For these reasons, the court concludes that Rising Tide is the more equitable distribution method and approves Section 5 of the Receiver's Plan.

### B. Approval of the Claim Schedules as Amended.

Because the Rising Tide method of distribution will be applied in this case, it is necessary to consider how the application of this method will apply to the claims of those investors who have received third-party recoveries of their losses. First, as a general principle, it is appropriate for the Receiver to consider amounts received by investors in settlement of their claims with third parties in determining those investors' claim amounts for purposes of making distributions in this case. Any third-party recovery made by an investor related to a loss he or she suffered by

---

[7] The court notes that the business, which was ultimately named True Prism, appears to have been a legitimate enterprise, which is why it was not included in the receivership estate. While the court understands that Dr. Forrest lost a substantial amount of money when True Prism failed, it recognizes that, had it succeeded, Dr. Forrest would not have a basis for complaining about withdrawing these funds from a Ponzi scheme and reinvesting them into a successful enterprise.

investing with Parish necessarily reduces that investor's loss in this case. If the Receiver were to ignore such recoveries in determining investors' losses for purposes of distributions in this case, investors who obtained third-party recoveries would stand to receive distributions in this case that were not proportional to their actual losses. See <u>S.E.C. v. Capital Consultants, LLC</u>, 397 F.3d 733, 738 (9th Cir. 2005) (stating that ignoring third-party recoveries in a receivership context "would make for a more inequitable distribution of assets by recognizing more loss than [the investors who obtained third-party recoveries] actually suffered."). Indeed, an investor who recovered <u>all</u> of his losses from a third-party would stand to collect a double recovery by also receiving a distribution payment in this case, <u>see</u> <u>id.</u> at 740, thereby creating an incentive for the type of detrimental "race to the courthouse" discussed above. Accordingly, to promote an equitable distribution, investors who have obtained third-party recoveries should have their claims reduced in some manner.

However, because the Receiver will be applying the Rising Tide method of distribution, the manner by which the Receiver reduces those investors' claims may have a profound effect on the amounts the investors stand to receive in distributions from the receivership estate. Under Rising Tide, treating third-party recoveries as Allowed Amounts Previously Received will result in a dollar-for-dollar reduction in the amount that an investor would otherwise have been entitled to receive in a distribution from the estate. On the other hand, if third-party recoveries are treated instead as reductions of the investor's Allowed Actual Investments, the investor's total loss will be proportionally reduced by the third-party recoveries without a dollar-for-dollar reduction in the amount the investor stands to receive.

As an example of this, an investor who invested $100,000 with Parish and received $0 in returns over the course of the investment scheme may stand to receive approximately 18.6% of

her loss, or $18,600, in the initial distribution by the Receiver (subject to the tax issues discussed below). However, if that investor obtained a third-party recovery of $20,000 and the recovery amount is considered an Allowed Amount Previously Received, the investor will be deemed to have received 20% of her loss already and will not receive any distribution from the estate (because her returns will place her above the "tide line" of 18.6%)—despite the fact that she has still suffered an $80,000 loss and received no returns from Parish during the course of the investment scheme. On the other hand, if the third-party recovery is treated as a reduction of the investor's Allowed Actual Investment rather than an Allowed Amount Previously Received, the investor's total investment will be reduced to $80,000 with $0 in returns, and she will receive a distribution of 18.6% of $80,000, or $14,880. Using this second approach appropriately takes into account the reduction to the investor's loss achieved by the third-party recovery without unduly penalizing the investor for the recovery.

At the hearing on the Motion to Approve Claim Schedules, the Receiver's counsel advised the Court that the Receiver agrees with the objecting investors that it will be more equitable to treat third-party recoveries as reductions from investors' Allowed Actual Investments instead of as Allowed Amounts Previously Received.[8] On the basis of this recommendation, objecting investor Steven L. Smith withdrew his objection to the Receiver's motion. The other objecting investors did not present oral arguments at the hearing; however,

---

[8] Similarly, the receiver in Capital Consultants changed his initial recommendation that third-party recoveries be used to reduce investors' claims on a dollar-for-dollar basis to a recommendation that only fifty percent of the recoveries be used to offset the investors' claims. Capital Consultants, 397 F.3d at 738. Because Rising Tide is being applied in this case rather than Net Loss (which was used in Capital Consultants), the Receiver's revised proposal has the net effect of taking third-party recoveries into consideration without a dollar-for-dollar reduction in investors' total distribution amounts. Also, like the receiver in Capital Consultants, the Receiver in this case will only consider the amounts recovered by investors from third parties net of all attorneys' fees and expenses incurred in obtaining such recoveries.

17

the court believes that the concerns raised in their objections are appropriately addressed by the Receiver's new recommendation.

The Receiver's revised recommendation strikes a fair balance between the need to account for third-party recoveries and the interest in not unduly penalizing investors for obtaining such recoveries prior to a distribution from the estate. Accordingly, the court adopts the Receiver's recommendation and the Plan is hereby amended accordingly. The revised Schedule of Allowed Investor Claims containing the amended claim amounts for each investor who is known to have received a third-party settlement payment in this case is attached to this order.

For the foregoing reasons, it is hereby **ORDERED**:

1. Section 5 of the Plan is hereby approved.

2. The Receiver is authorized and directed to distribute funds from the receivership estate to claimants with approved claims in accordance with the method set forth in Section 5 of the Plan.

3. The first paragraph of Section 3.3 of the Plan is hereby amended to read:

"With respect to each Investor Claim, the Receiver will determine: (1) the principal amount(s) invested with Parish ("Actual Investment"); *and*, (2) the amount(s), if any, paid to or on behalf of the Investor Claimant by Parish (or any other party in complete or partial satisfaction of the amounts claimed) ("Amount Previously Received"). Notwithstanding any other provision herein, any amount received or obtained by an investor from a third-party through settlement or judgment related to the investor's loss arising from any investment with Parish or Parish's related entities (a "Third-Party Recovery") shall be considered as a reduction of the amount of the investor's Actual Investment. A reduction for any Third-Party Recovery

shall be net of attorneys' fees and expenses incurred in obtaining such recovery. In making these determinations, the following guidelines shall be applied: . . ."

4. The Receiver's Motion to Approve Claim Schedules is granted and the Schedule of Allowed Investor Claims (as amended in accordance with this Order) and the Schedule of Allowed Creditor Claims are approved.

5. The Receiver is authorized to make distributions from the receivership estate in accordance with the claim amounts listed in the approved claim schedules.

6. The court finds that there is no just reason for delay for an entry of a final judgment as to the approval of Section 5 of the Plan and directs the entry of judgment pursuant to Federal Rule of Civil Procedure 54(b).

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**CHIEF UNITED STATES DISTRICT JUDGE**

**Charleston, South Carolina**
**February 10, 2010**

19