UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

ALBERT E. PARISH, JR., PARISH ECONOMICS, LLC, and SUMMERVILLE HARD ASSETS, LLC,

    Defendants.

CIVIL ACTION NO.
2:07-cv-00919-DCN

**ORDER APPROVING THE RECEIVER'S SETTLEMENT AGREEMENT
WITH BATTERY WEALTH MANAGEMENT, WAYNE CASSADAY,
AND CONTINENTAL CASUALTY COMPANY**

This matter is before the court on the Receiver's Motion to Approve Settlement and for Related Injunctive Relief ("Motion to Approve Settlement Agreement") (Dkt. # 332). For the reasons set forth below, the court grants the Receiver's motion, approves the settlement agreement at issue therein, and issues the injunctive relief requested in the motion.

**I. Background for the Settlement Agreement.**

1.     This enforcement action was filed on April 5, 2007, by the Securities Exchange Commission against Albert E. Parish ("Parish"), Parish Economics, LLC ("Parish Economics"), and Summerville Hard Assets, LLC ("SHA"). The SEC alleged that Parish operated a fraudulent investment scheme in violation of securities laws through Parish Economics and SHA.

2.     Pursuant to temporary and preliminary orders dated April 5 and 12, 2007, this court appointed S. Gregory Hays as receiver for defendants, authorizing him to, among other things,

1

pursue all claims which may be brought by receivership entities and settle any of those claims as may be advisable or proper in the administration of the receivership estate.

**A.     General History of Parish's Investment Scheme.**

3.     The Receiver and the professionals working with him have conducted an extensive investigation of the fraudulent investment scheme conducted by Parish. As more fully set forth in the Receiver's interim reports filed with this court, the scheme involved "investment pools" – the Hedged Income Pool, the Stock Pool, the Commodity Futures Pool, and the Hard Asset Pool – which were operated and maintained by Parish Economics and SHA and purportedly managed by Parish using a confidential, proprietary "mathematical model" developed by him as a part of his research as an economist.

4.     Investors were provided with periodic reports indicating that each of these pools was yielding high returns that consistently out-performed traditional investments and the market. Parish and Parish Economics expressly represented to investors that, in operating the investment pools, Parish used a confidential, proprietary "mathematical model" developed by him as a part of his research as an economist.

5.     Parish Economics was originally formed on December 31, 1996. At the time of its formation, Parish expected that investors would become members of Parish Economics. Parish Economics operated as a partnership for federal income tax purposes from 1998 through 2004, and filed partnership returns for each of those years that included K-1's for investors indicating that they were "Limited Partners" or "other LLC Members." Parish Economics did not file a tax return for 2005 or 2006, but did issue K-1's to investors.

6. Over time, approximately 630 individuals invested in excess of $100 million in the investment pools. As of the date of the hearing on the Receiver's Motion to Approve Settlement Agreement, over 540 investors had filed claims with the Receiver.

7. On October 5, 2007, Parish entered a guilty plea to two counts of mail fraud and one count of making a false statement to an agency of the federal government.

**B. Parish's Association with Battery Wealth Management and Wayne Cassaday.**

8. In 2000, Parish started Battery Investment Company, Inc. ("BIC"), an investment advisory firm, with Wayne Cassaday ("Cassaday") and three accountants.

9. The three accountants left BIC in 2003. Cassaday bought the share of one of the accountants and the firm purchased the other two. At that time, Cassaday became the majority owner of BIC.

10. In 2005, BIC changed its name to Battery Wealth Management, Inc. ("BWM"). The firm originally operated as an investment advisory/asset management firm. After the name was changed to BWM, the firm began to offer additional services, including financial planning and tax preparation.

11. Both BIC and BWM were registered companies in South Carolina. In 2006, BWM registered with the Securities and Exchange Commission.

12. BWM was capitalized with funds from Cassaday and Parish. The funds were used to purchase assets and pay salaries and overhead costs. Parish was a Vice President of BWM until approximately March 2007. Cassaday was President and Chief Compliance Officer of BWM.

13. As part of his investigation, the Receiver and his counsel determined the following with respect to BWM and Cassaday:

   a. Beginning in 2002, BWM recommended to its clients that they participate in Parish's investment pools. BWM, through Cassaday and Parish, ultimately sold approximately $6.5 million of these investments to 25 of BWM's clients;

   b. BWM provided quarterly statements to investors that showed positive performance and ever-increasing asset values. Before recommending that BWM's clients invest in the pools, Cassaday reviewed the quarterly account statements provided by Parish's LLC and discussed the investment pools with Parish. Cassaday also viewed Parish's website, which was provided as a direct link from BWM's website;

   c. Cassaday had reviewed Parish's personal financial statements, which showed that Parish's sources of reported income were disproportionately low in comparison to the high level of personal expenses reflected by his lavish and flamboyant lifestyle;

   d. Cassaday knew that Parish's Loan Pool consisted of Parish's personal notes, and that Parish had issued his notes to (and was thus borrowing money from) the IRA accounts of many of BWM's clients;

   e. In the fall of 2006, Cassaday was told that Parish was experiencing personal cash flow problems;

   f. Cassaday subsequently learned that a property Parish owned might face foreclosure;

g. Cassaday discovered that one of Parish's investment pools had been unable to comply with a redemption request from a BWM client within the requisite 5-day period and instead required six weeks to return the investor's money;

    h. Parish admitted to Cassaday that he had deliberately delayed the investor's redemption in hopes of finding replacement investor funds to avoid the liquidation of specific bonds; and

    i. Despite these red flags, Cassaday never took any steps to follow up or to inquire whether the pooled funds in which BWM advised its clients to invest were, in fact, invested consistent with the representations made to investors.

14. Notwithstanding any of the above, the Receiver has advised this court that, despite his extensive investigation into the facts and circumstances surrounding Parish's relationship with BWM and Cassaday, the Receiver has not uncovered any facts which in any way indicate that BWM or Cassaday were aware of or were knowingly complicit in the perpetration of Parish's fraudulent investment scheme.

15. Based on his findings, the Receiver and his counsel concluded that, as receiver for Parish Economics and SHA, he could assert viable claims against BWM, Cassaday, and BWM's and Cassaday's professional liability insurer, Continental Casualty Company ("Continental").

16. For their part, Cassaday, BWM, and Continental deny the Receiver's determinations set forth in Paragraph 13 of this Order and deny any wrongdoing or liability to the Receiver or anyone else relating to the matters set forth above.

17. It is unclear at this point whether Continental would be liable to pay any damage awards against BWM or Cassaday. Continental has filed a declaratory judgment action in this court captioned <u>Continental Casualty Company v. Battery Wealth, Inc. and Wayne Cassaday</u>,

Case No. 2:09-CV-00605-WOB (the "Declaratory Judgment Action"). Among other things, the Declaratory Judgment Action seeks a determination of whether coverage is available to BWM and/or Cassaday under Tax and Financial Services Professional Liability Policy Number TFS-253996244, issued to BWM for the periods May 1, 2006 to May 1, 2007 ("Policy No. 1") and May 1, 2007 to May 1, 2008 ("Policy No. 2") (collectively, "the Policies"). The Receiver and his counsel report that these are the only policies potentially applicable to potential claims by the Receiver and other investors, and, therefore, the only basis under which Continental may be liable for any damage awards obtained by the Receiver or investors against BWM and/or Cassaday.

18. Even though BWM, Cassaday, and Continental (the "Settling Parties") deny that any of them is liable to the Receiver (or any other claimant) relating to the matters set forth herein, they have engaged in settlement negotiations with the Receiver, which resulted in the execution of the settlement agreement attached to the Receiver's Motion to Approve Settlement Agreement (the "Settlement Agreement"). A copy of the Settlement Agreement is attached to this Order as Exhibit "A" and incorporated herein by reference.

**C.** **The Settlement Agreement.**

19. Under the circumstances of this case, the terms of the Settlement Agreement are fair and reasonable. In particular:

   a. A very large percentage (95.0%) of the potential, though disputed, coverage under Continental's insurance policies is being committed to this settlement, pending the outcome of the Declaratory Judgment Action. In the event coverage is found to exist under the policies, the Settling Parties have conceded liability for purposes of the Allocation Determination Procedure provided for in the

Settlement Agreement. According to the Receiver and his counsel, it is improbable that the Settling Parties would ever be willing or able to pay significantly more from the policies to resolve the subject claims by agreement than is currently provided for under the Settlement Agreement.

b. The amounts that could potentially be paid into the Settlement Fund provided under the Settlement Agreement may effectively leave the Settling Parties unable to respond to any additional claims for damages potentially arising from or related to Parish's fraudulent investment activities.

c. The settlement benefits a large number of investors. Approximately 130 investors could claim an association with BWM, and therefore have potential claims against the Settling Parties. Each such investor will have the opportunity for a significant cash benefit in the Allocation Determination Procedure.

d. When the cost of litigation (by either the Receiver or investors) is taken into account, along with the large percentage of coverage under Continental's insurance policies being committed to this settlement and the relatively limited assets of BWM and Cassaday, it is improbable that any possible future recovery would net more to investors than the proposed settlement.

e. The court is satisfied that it is highly unlikely that any other plaintiff or group of plaintiffs could obtain a more favorable financial settlement than that proposed in the Settlement Agreement, nor one that could benefit as many aggrieved investors as stand to be benefited under the Settlement Agreement.

20. As referenced above, approximately 130 investors may have claims against the Settling Parties. If the proposed settlement is not approved, it is reasonable to assume that many

other investors will file suits against the Settling Parties, thereby creating a "race to the courthouse," which is not in the best interest of any investor. Moreover, because the settlement proceeds can be administered through the receivership and distributed to all investors with valid claims against the Settling Parties, as determined pursuant to the Allocation Determination Procedure, the result will be far more fair and efficient than having investors compete for recoveries through the prosecution of multiple lawsuits against the Settling Parties.

21. The only party that has objected to the Receiver's Motion to Approve Settlement Agreement is Charles Schwab & Co., Inc. ("Schwab"). (Dkt. # 335.) Schwab has asserted third-party claims against BWM and Cassaday in a separate action before this court, <u>Brown, et al v. Charles Schwab & Co., Inc.</u>, Civil Action No.: 2:07-CV-3852-DCN. Schwab will be treated as an "Active Claimant" under the Settlement Agreement, and will be entitled to submit a claim in the Allocation Determination Procedure on the same basis as other investors who were clients of BWM. As admitted by Schwab's counsel during the hearing on this motion, Schwab will only be able to assert such a claim if it is found liable to the plaintiffs in the <u>Brown</u> action.

## II. Discussion

### A. The Court's Power to Enter a Bar Order.

The payments and releases in the Settlement Agreement are conditioned upon this court's entry of a "bar order" enjoining the filing of and/or continued prosecution of claims by all third-parties (including investors) against the Settling Parties arising out of or in any way connected with: (a) the investment-related activities of Parish, Parish Economics, and/or SHA or any affiliated "investment pool"; (b) Parish's employment by and affiliation with BWM and Cassaday; (c) any investment made by any person or entity in or with Parish or any of the receivership entities; and/or, (d) any other affiliation with or support of Parish by BWM or any

of its current and/or former employees, officers or principals.  The Receiver has moved for this court to enter such a bar order in conjunction with approving the Settlement Agreement.

Before determining whether the settlement, in conjunction with a bar order, is in the best interest of the receivership entities and their creditors, it is first necessary to determine whether the court has the power to issue a bar order enjoining new or existing litigation.  The All Writs Act authorizes federal courts to "issue all writs necessary and appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651.  This includes the authority "to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained."  In re Am. Honda Motor Co., Inc., Dealerships Relations Litig., 315 F.3d 417, 437-38 (4th Cir. 2003) (internal quotations omitted) (quoting Penn. Bureau of Corr. v. U.S. Marshals Serv., 474 U.S. 34, 40 (1985)).

A "district court has within its equity power the authority to appoint receivers and to administer receiverships."  Gilchrist v. Gen. Electric Capital Corp., 262 F.3d 295, 302 (4th Cir. 2001) (citing Fed. R. Civ. P. 66).  Moreover, a "district court has within its equity power the authority to protect its jurisdiction over a receivership estate through the All Writs Act, 28 U.S.C. § 1651, and through its injunctive powers, consistent with Federal Rule of Civil Procedure 65.  Of course, the exercise of this authority is always subject to other limitations, statutory and constitutional, which limit the jurisdiction of federal courts."  Id.  By appointing a receiver in this matter, the court created a receivership estate over which it has *in rem* jurisdiction.  Id.  That jurisdiction extends to all assets of the estate, including choses of action.  See id.  Accordingly, this court has the power under the All Writs Act to issue injunctions in

order to protect the estate's choses of action against the Settling Parties (including any settlement reached in connection with those claims).

The power conferred by the All Writs Act extends beyond issuing only injunctions that are necessary to carry out the district court's jurisdiction. Application of the All Writs Act is "not limited to those situations where it is 'necessary' to issue the writ or order in the sense that the court could not otherwise physically discharge its . . . duties." United States v. N.Y. Tel. Co., 434 U.S. 159, 173 (1977) (citation omitted). Rather, a district court may issue an injunction when "calculated in [the court's] sound judgment to achieve the ends of justice entrusted to it." Adams v. United States, 317 U.S. 269, 273 (1942). Finally, the court has the power to extend the injunction to third-parties who are not parties to the action nor were involved in the wrongdoing: "The power conferred by the Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice and encompasses even those who have not taken any affirmative action to hinder justice." N.Y. Tel., 434 U.S. at 174 (internal citations omitted).

Having concluded that the court possesses the power to issue the bar order, the propriety of issuing such an order is discussed below as part of considering the sufficiency and fairness of the agreement as a whole.

**B.    Sufficiency and Fairness of the Agreement.**

The primary purpose of the equitable receivership is the marshaling of the estate's assets for the benefit of all the aggrieved investors and other creditors of the receivership entities. See S.E.C. v. Hardy, 803 F.2d 1034, 1038 (9th Cir. 1986) ("[A] primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court

for the benefit of creditors."). In administering the receivership, the district court has "broad discretion" to take actions it deems appropriate to effectuate the purpose of the receivership. See United States v. Vanguard Inv. Co., 6 F.3d 222, 226-27 (4th Cir. 1993).

The proposed settlement is consistent with and furthers the purposes of the receivership. The settlement proceeds, which could total as much as $2.85 million, will ultimately be distributed to investors and victims of Parish's fraudulent investment scheme, who were clients of BWM, in accordance with the outcome of the Allocation Determination Procedure. As set forth above, it is highly unlikely that any such investor could obtain a more favorable settlement than that proposed in the Settlement Agreement, nor one that could benefit as many aggrieved investors as stand to be benefited under the Settlement Agreement.

This settlement is also a fair and efficient means of distributing the compensation that may be owed by the Settling Parties to qualified investors. The fairness of this solution is clear in light of the alternative. Investors who were clients of BWM could bring individual suits against the Settling Parties, which would require expensive and protracted litigation. If litigation were pursued, investors would face an uncertain outcome and perhaps, years later, could recover nothing in their suits. The amount of resources it would take for approximately 130 investors to individually pursue their claims against the Settling Parties demonstrates the economic irrationality of individual litigation relative to the Allocation Determination Procedure provided for in the Settlement Agreement. Given the costs and duration of litigation, many investors would choose not to pursue claims against the Settling Parties – leaving those investors with only part of the recovery to which they would otherwise be entitled.

The Receiver has been able to negotiate a fair, global settlement with the Settling Parties that assures that those investors who are determined to have valid claims in the Allocation

Determination Procedure will realize relatively timely compensation for those claims. Failing to approve this settlement would result in a drawn-out, inefficient, and chaotic administration of justice, assuming justice in those circumstances could be achieved at all.

Among the investors who choose to pursue individual litigation, there will certainly be a "free for all" competition to obtain recovery against the Settling Parties. That "race to the courthouse" will likely result in disparate outcomes, which would run counter to the goals of this receivership and would likely impair the Receiver's and, ultimately, this court's ability to fairly administer the receivership estate. To preserve the court's equitable powers, particularly the power to establish a fair and efficient scheme for administering the estate and distributing its assets to the aggrieved investors, it is necessary to enter the bar order. Thus, the court finds it appropriate and necessary to enjoin the further filing of claims and/or continued prosecution of claims pending against the Settling Parties arising out of or in any way connected with: (a) the investment-related activities of Parish, Parish Economics, and/or SHA or any affiliated "investment pool"; (b) Parish's employment by and affiliation with BWM and Cassaday; (c) any investment made by any person or entity in or with Parish or any of the receivership entities; and/or, (d) any other affiliation with or support of Parish by BWM or any of its current and/or former employees, officers or principals.

The court recognizes that the Anti-Injunction Act generally prohibits this court from enjoining the prosecution of pending state-court actions. See 28 U.S.C. § 2283. Although some investors have filed suits against BWM and Cassaday in state court, all of those cases have now been dismissed or stricken from the docket pursuant to South Carolina Rule of Civil Procedure 40(j). The former plaintiffs are currently working with court administration to have those cases dismissed with prejudice. Accordingly, there are no pending state court cases against the

Settling Parties, and the Anti-Injunction Act is not applicable and does not preclude the bar order sought in this case.

Further, it should be noted that entry of the bar order is necessary to preserve and aid this court's jurisdiction over the receivership estate, such that the Anti-Injunction Act would not prohibit the bar order even if there were pending state court actions, which there are not.[1]

For the foregoing reasons, it is hereby **ORDERED**:

1. The settlement between the Receiver and the Settling Parties, as specifically provided for in the Settlement Agreement attached as Exhibit A, is hereby approved and the parties are directed to perform in accordance with its terms.

2. Schwab is to be treated as an Active Claimant for purposes of the Allocation Determination Procedure set forth in the Settlement Agreement.

3. Any and all persons or entities, including, but not limited to, those who purchased investments from Parish or any of the receivership entities, who are creditors of Parish or any of the receivership entities, and/or who are former clients of BWM and Cassaday, are hereby enjoined from the filing or continued prosecution of any third party claims or causes of action against BWM, Cassaday and/or Continental arising out of or in any way connected with: (a) the investment-related activities of Parish, Parish Economics, and/or SHA or any affiliated "investment pool"; (b) Parish's employment by and affiliation with BWM and Cassaday; (c) any investment made by any person or entity in or with Parish or any of the receivership entities; and/or, (d) any other affiliation with or support of Parish by BWM or any of its current and/or former employees, officers or principals.

---

[1] There is a clear exception to the Act when the injunctive relief is necessary in aid of the district court's jurisdiction.

13

4. Nothing in this Order is intended to nor should be construed to release, limit or otherwise modify any right, claim or defenses that the Receiver or any individual investor might have with respect to individual claims submitted to the Receiver to recover their or their family's individual investment losses as a part of the receivership claims administration process.

5. Any party, attorney or other person who acts in a manner contradictory to this Order shall be subject to such remedies for contempt as the court shall deem appropriate. This court shall retain exclusive jurisdiction over the parties with respect to any disputes related to the interpretation and performance of the Settlement Agreement.

6. Nothing in the Settlement Agreement or this Order shall operate in any way to release, waive or limit the Receiver's rights, if any, to pursue claims against other third parties.

7. The court finds that there is no just reason for delay for an entry of a final judgment as to the approval of the settlement and bar order and directs the entry of judgment pursuant to Federal Rule of Civil Procedure 54(b).

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON
CHIEF UNITED STATES DISTRICT JUDGE**

**Charleston, South Carolina
February 10, 2010**